UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANNE GANEM, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:12-cv-00128-GZS |
| | ) | |
| LIBERTY LIFE ASSURANCE | ) | |
| COMPANY OF BOSTON, | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION

This action arises under the jurisdictional provision of the Employee Retirement Income

Security Act, 29 U.S.C. § 1132(e), and presents a civil action to recover benefits pursuant to 29

U.S.C. § 1132(a).  Ganem asserts that Liberty Life should have awarded her long-term disability

benefits for fibromyalgia and that Liberty Life breached fiduciary duties by the way in which it

decided her claim.  The parties have presented the Court with cross motions for judgment on the

administrative record, which motions the Court has referred for report and recommended

decision.  For reasons that follow, I recommend that the Court vacate that portion of the

administrative decision that denies Ganem the first 24 month of LTD benefits, remand with

instructions to award Ganem those benefits, and otherwise affirm the administrative decision.

### FACTS

**A.     Ganem's Claim and the Administrative Process and Decision**

Plaintiff Anne Ganem worked for Lowe's Companies, Inc., between April 2009 and

January 2011.  As of April 2009, Ganem's medical records included an assessment by her then

treating physician, Jean Benson, MD, of Brewer Medical Center, that Ganem was suffering from

clinical depression, anxiety, and muscle aches that Dr. Benson believed were representative of a developing fibromyalgia related to nonrestorative sleep. Treatment for these symptoms was essentially limited to a prescription for Wellbutrin. (Administrative Record (AR) 339, 340, 343, 344.) In December 2010, Ganem's medications expanded in connection with a hypertension diagnosis. (AR 336.) In January 2011, Ganem began treating with Dr. Nancy O'Neill, MD, though she remained a patient of Brewer Medical Center. Dr. O'Neill noted reports of muscle cramps, weakness, aches, and fatigue. (AR 331-32.)

After becoming a Lowe's employee, Ganem elected to participate in a Lowe's sponsored employee benefit plan, the Lowe's Group Disability Income Policy, issued and administered by Defendant Liberty Life Assurance Company of Boston. The policy will be referred to herein as "the Plan." (See AR 6-52.) Ganem filed a claim for disability benefits in January 2011. Neither party directs the Court to Ganem's initial claim form, but Liberty Life understood that Ganem's claim was premised on her symptoms of fatigue, malaise, muscle cramps, muscle weakness, and muscle aches. (AR 491.)

In a February 4, 2011, certification submitted in support of Ganem's contemporaneous request for leave under the Family Medical Leave Act[1], Dr. O'Neill indicated that Ganem was suffering from a chronic condition requiring both rest and treatment, which condition she described as symptoms of overwhelming fatigue and muscle pain related to fibromyalgia. (AR 465.) During a March 12, 2011, examination, Dr. O'Neill found "numerous trigger points to the shoulders, upper arms, and thighs, as well as along her back," with no joint pain or swelling, normal-appearing thought content, and the appearance of "a little depression." (AR 298.) After Ganem trialed certain medications without report of success, on April 4 Dr. O'Neill referred

---

[1] Liberty Life also administered Lowe's provision of FMLA leave and state law medical leave requirements. (AR 281.)

Ganem for consultation with Dr. Donald Krause, MD, a rheumatologist, for confirmation of Dr. O'Neill's fibromyalgia diagnosis and assistance with treatment options.  (AR 283.)  However, it would be several months before Ganem would see Dr. Krause.

Liberty Life initially denied Ganem's claim for short-term disability benefits in a letter dated March 16, 2011, based on Ganem's failure to support her claim with the necessary medical records.  (AR 429.)  At some point, Liberty Life reversed course and awarded Ganem short-term benefits, though I have been unable to locate the award letter in the record and neither party references it.  On May 2, Liberty Life wrote Ganem to explain that her STD benefits ended April 25, 2011, and that her claim for benefits would be reevaluated under the Plan's long-term disability provisions.  Liberty Life also informed Ganem that her claim was referred to Brian Terry, a senior case manager, for this purpose.  (AR 258.)  Ganem's responses to a new activities questionnaire indicated that her ability to perform various activities varied from day to day and that some days she could not even get out of bed.  (AR 235.)  Ganem explained to Terry, among other things, that she was not able to commit to a regular work schedule because of experiencing too many "bad days."  (AR 237.)

In June 2011, Terry sought an independent medical review of Ganem's claim file.  (AR 227.)  This was to be a paper review.  There was no request for an independent medical examination.  The referral agency, MLS Peer Review Services, referred the matter to Tanya Lumpkins, MD, certified by the American Board of Rheumatology.  (AR 226.)  Dr. Lumpkins's "independent peer review" report is dated June 16, 2011.  Dr. Lumpkins reviewed the file, which included, among other things, Dr. Benson's and Dr. O'Neill's progress notes, and prescription records.  (AR 222-23.)  Dr. Lumpkins noted that laboratory testing had ruled out other causes for Ganem's symptoms, that she was tried on numerous medications including Flexeril and

3

Tramadol, which she did not tolerate, and Cymbalta, which Ganem reported did not provide much help, and that she was referred to a fibromyalgia support group.  Dr. Lumpkins noted a March 11, 2011, progress note by Dr. O'Neill that described a fibromyalgia physical examination.  That note indicated numerous trigger points to the shoulders, upper arms, thighs, and back, without joint pain or swelling.  The note also indicated the appearance of some depression.  Dr. Lumpkins attempted to conference with Dr. O'Neill but was unsuccessful.  (AR 224.)  Based on her review of the medical records, Dr. Lumpkins opined that "the records support the claimant has been diagnosed with fibromyalgia," but that they were not sufficient to support a finding of any actual physical restrictions and would only support an assessment that Ganem would suffer some cognitive lethargy and dysfunction due to the common side-effects of routinely prescribed medications like Flexeril and Cymbalta.  (AR 225.)  Dr. Lumpkins also noted that the treatment plan reflected in Dr. O'Neill's records was consistent with the standard of care in rheumatology.  (Id.)

In a letter dated June 17, 2011, Brian Terry informed Ganem, "Based on the medical information in relation to your occupation requirements, you do not meet your Policy's definition of disability, and we must deny your claim for benefits."  (AR 220.)  He explained that the definition of disability for purposes of long-term disability benefits required that she not be able to perform her sales specialist occupation as it is normally performed in the national economy, which Terry classified as a light-duty occupation.  (AR 219-220.)

In a June 28, 2011, progress note, Ganem reported to Dr. O'Neill that she was experiencing the worst pain ever, rated at 10 on a 10-point scale.  (AR 162.)  She reported just learning of the denial of her claim and she was very upset.  (Id.)  Ganem also reported that she had an appointment with Dr. Krause that would occur in the near future.  Dr. O'Neill supplied

Ganem with a starter pack of the drug Savella and instructed her to report whether it helped. (AR 164.)  Ganem saw Dr. O'Neill again on August 26.  She reported being very depressed and very tired and stated that she was willing to try the drug Lyrica, which Dr. O'Neill prescribed. (AR 158-160.)

Ganem's consultative examination with Dr. Krause occurred on September 8, 2011.  (AR 189.)  Dr. Krause noted Ganem's "major problems" as "chronic widespread pain, decreased mobility, very poor energy, severe fatigue, poor concentration and decreased memory."  (AR 155.)  On physical examination he found that Ganem's fibromyalgia trigger points were positive "both above and below the diaphragm in a symmetrical pattern."  (Id.)  Dr. Krause agreed with the fibromyalgia diagnosis.  (Id.)  He also indicated that her major problems were with concentration and lifting heavy objects, but that she had no trouble sitting, hearing, or speaking, though she lacked the energy to travel.  (Id.)  He advised that her dose of Lyrica be increased as tolerated.  (AR 156.)

Ganem returned to Dr. O'Neill on September 29, 2011, reporting that her pain was unchanged, but that she was sleeping better with the help of Lyrica.  (AR 170.)  Her Lyrica prescription was continued and Dr. O'Neill added an antidepressant called Citalopram.  (Id.)

Ganem appealed the denial of benefits by letter dated November 30, 2011, and included with her appeal paperwork two fibromyalgia medical source statements and updated records from Dr. O'Neill and Dr. Krause.  (AR 141.)  In one fibromyalgia source statement, Dr. Krause reported that Ganem meets the criteria for fibromyalgia and depression, with a poor prognosis. For clinical findings, he indicated positive trigger points with no positive inflammatory markers. (AR 145.)  In terms of functional ability, Dr. Krause indicated, among other things, that Ganem could sit for only 15 minutes before needing to stand and stand for only 15 minutes before

needing to sit.  (AR 147.)  He opined that she could not do either activity for more than two hours over the course of a day, but would need to walk around for at least 30 minutes daily, depending on her symptoms.  (Id.)  He further opined that she could never lift 10 or more pounds and would likely be absent from work more than five days per month.  (AR 148-149.)  In the other fibromyalgia source statement, Dr. O'Neill offered similar assessments.  These included clinical findings of multiple trigger points, overwhelming fatigue, and a pain level of 7-8 in 10.  (AR 150.)  As for function, Dr. O'Neill regarded Ganem's sit and stand abilities as somewhat more reduced than Dr. Krause, but opined that Ganem could rarely lift 10 pounds.  (AR 152-153.)

Ganem's counsel also arranged for a functional capacity evaluation on December 8, 2011.  The individual who performed the evaluation reported that the results of testing showed "the levels the client perceives as [her] capability, even though the client can physically do more."  (AR 131.)  He explained that the client terminated activities early and likely believed that working beyond her perceived levels would cause her pain or increased discomfort.  (Id.)  He assessed, among other things, that Ganem could frequently walk moderate distances, but could only perform work for between three and four hours in a workday.  (AR 132.)

Ganem's appeal went to Nancy Winterer, an appeal review consultant in Liberty Life's appeal unit.  Winterer referred the file for another independent file review.  (AR 115.)  Referral agency MCMC sent the file to Dr. Steven Lobel, M.D., board certified in physical medicine and rehabilitation/pain medicine.  (AR 106.)  Dr. Lobel reviewed the file and reported several attempts to contact Dr. O'Neill, without success.  (AR 103-104.)  He concluded that, from a pain management and rehabilitation perspective, Ganem did not have medical conditions associated with impairment.  (AR 105.)  He found the functional capacity evaluation invalid based on Ganem's failure to provide a full effort throughout the testing.  He further found "a lack of

clinical data supporting a neuromuscular pathology that would preclude full time work." (<u>Id.</u>)
Based on his review of the file, Dr. Lobel opined that Ganem "does have the capacity to perform
sustained full time unrestricted work, during the periods 01/25/2011 through 04/25/2011, and
04/26/2011 forward." (<u>Id.</u>)  After issuing this case report, Dr. Lobel received a return call from
Dr. O'Neill, who described her findings and indicated that she did not believe Ganem could
work due to pain.  Dr. Lobel's opinion was not changed.  He indicated that although Ganem has
a diagnosis of fibromyalgia, there were "no deficits on examination" and Ganem failed to
provide full effort at her functional capacity evaluation.  In his view, there was "a lack of clinical
data supporting a neuromuscular pathology that would preclude full time work," and that based
on the records reviewed, from a pain management perspective, Ganem had the capacity to
perform sustained, full-time, unrestricted work.  (AR 98.)

By letter dated February 21, 2012, Winterer informed Ganem that she was unable to alter
the original decision to deny benefits.  (AR 84.)  Winterer indicated that although Drs. O'Neill
and Krause had noted Ganem's complaints of occasional cognitive and mental health symptoms,
"concern for the severity of these symptoms has not lead to formal cognitive testing" or "to a
psychiatry or psychology referral." (AR 86.)  On this basis Winterer concluded that there was no
medical evidence of cognitive or mental health impairment sufficient to prevent Ganem from
working in the sales specialist occupation.  (<u>Id.</u>)  As for physical symptoms, Winterer did not
offer an independent analysis.  Rather, at the beginning of her letter she recited the findings of
Drs. Lumpkins and Lobel.  (AR 84-85.)  However, in conclusion she stated:

> Thus, we conclude, based on a review of all of the medical documentation
> contained in Anne Ganem's disability claim file, there is insufficient medical
> evidence to establish that Ms. Ganem's condition is of a nature and severity that
> prevents her from performing the material and substantial duties of her own Sales
> Specialist occupation.  Therefore, Ms. Ganem does not meet the definition of

Long Term Disability, as defined in the Lowe's Companies, Inc. Group Disability Income Policy, and no Long Term Disability benefits will be paid.

(AR 86.)

On March 6, 2012, Ganem, through counsel, notified Liberty Life that she would be filing suit and took issue with how, in her terms, Liberty Life had "transmuted what is clearly a medium to heavy job into an undefined 'occupation' (national economy wise) which only requires a 'light' work capacity." (AR 74.)  She included a vocational assessment from Susan McCarron, a certified vocational rehabilitation counselor in support of a counter argument. (AR 74, 77-80.)  Winterer responded by letter dated March 9, 2012, stating that the appeal was exhausted and that there was no occasion to consider further documentation.  (AR 61.)

**B.      Policy Provisions**

It is undisputed that the Plan provides Liberty Life with discretion to construe the terms of the policy and to determine eligibility for benefits.  (AR 47.)  Liberty Life also reserves the right to determine whether a claimant's proof of loss is satisfactory.  (AR 48.)  Short-term disability (STD) benefits are paid for no longer than 13 weeks from the date of disability.  (AR 9.)  Long-term disability (LTD) benefits can extend the payment of benefits by 24 months or more. (AR 10.)

Submission of satisfactory proof is required to support a claim for benefits.  (AR 15, 20, 27.)  The Plan indicates that Liberty Life will only award short-term disability benefits upon proof of a disability due to injury or sickness, among other proof.  (AR 20.)  The Plan indicates that long-term disability benefits will only be paid upon proof of disability as well.  (AR 27.)  "Disability" is defined differently for purposes of short-term and long-term disability.  In the short-term context, disability means that the claimant is unable to perform the material and substantial duties of his or her own job.  In the long-term context, disability means, for purposes

8

of the first 24-month period, that the claimant is unable to perform the material and substantial duties of his or her own occupation. (AR 12.) "Own occupation" is another defined term. To determine the duties of a claimant's own occupation, Liberty says it will consider the occupation as it is normally performed in the national economy. (AR 14.) In order to receive LTD benefits beyond the 24-month period, a claimant must prove that she is unable to perform any occupation at all. (AR 12.)

**C.      The Sales Specialist Job Description**

Lowe's job description for the sales specialist position indicates that, among other things, individuals in the position must be able to operate store equipment including fork lifts, pallet jacks, and electrical lifts; move objects weighing up to 200 pounds with reasonable accommodations, stand and/or sit continuously and perform job functions for a full shift with meal break; bend, stoop, climb, balance, and crouch; handle and move items weighing up to 50 pounds without assistance; and tolerate inside and outside environmental conditions with possible exposure to hot, cold, wet, humid, or wind weather conditions. (AR 493-94.)

As noted previously, Liberty Life has based its benefits determination, in part, on a finding that Ganem's occupation, as it is performed in the national economy, is a light-duty occupation. Ganem's counsel challenges this finding and has introduced an assessment by a vocational rehabilitation counselor, Susan McCarron, who indicates, based on over 20 years of experience, that the lifting requirements of Lowe's sales specialist job clearly exceed a light-duty standard and fall into the medium-duty standard. McCarron's assessment describes multiple day-to-day requirements of Ganem's actual work that exceed the light-duty standard. (AR 77-80.)

STANDARD OF REVIEW

When a Plan bestows upon the plan administrator discretion to construe its terms and make eligibility determinations, the default standard of review for a court is to uphold the administrative decision unless it is arbitrary, capricious, or an abuse of discretion.  Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010).  An insurer's construction of its own policy language will be found arbitrary and capricious if the construction is unreasonable.  Matias-Correa v. Pfizer, 345 F.3d 7, 12 (1st Cir. 2003).  Benefits determinations are upheld so long as they are "reasoned and supported by substantial evidence."  Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004).  Substantial evidence is evidence "reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."  Id.

**A.**      **The Structural Conflict of Interest**

It is undisputed that Liberty Life has a structural conflict of interest based on the fact that it has to pay with its own fund any claim it approves.  "The fact that [Liberty Life] will have to pay [Ganem's] claim out of its own assets does not change [the] standard of review."  Glista v. UNUM Life Ins. Co. of Am., 378 F.3d 113, 125-26 (1st Cir. 2004).  However, the conflict is a factor that the court must take into consideration.  Cusson, 592 F.3d at 224 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)).  This factor generally proves less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy."  Id.  In effect, the court refrains from exercising de novo review or imposing special burden-of-proof rules or any special procedural or evidentiary rules, but considers as one factor that the administrator is laboring under a structural conflict of interest.  Glenn, 554 U.S. 117.

10

"[C]ourts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." Denmark v. Liberty Life Assur. Co., 556 F.3d 1, 9 (1st Cir. 2009). "[P]lan administrators, aware of *Glenn*, can be expected as a matter of course to document the procedures used to prevent or mitigate the effect of structural conflicts. That information will be included in the administrative record and, thus, will be available to a reviewing court." Id. at 10.

Liberty Life has prefaced its bound administrative record with the declaration of Heather Heins, who addresses the steps Liberty Life has taken to account for its structural conflict. She asserts that it is Liberty Life's practice to review claims fairly, without regard to whether the plan is self-funded by the employer or is insured by Liberty Life. (AR 2, ¶ 6.) She reports that claims managers are not compensated in a manner that incentivizes the non-payment of claims, but are "evaluated on the quality and accuracy of their claims decisions." (AR 3, ¶ 7.) Heins says that Liberty Life employs "management checks to identify inaccurate decision-making irrespective of whom the inaccuracy benefits," and notes that Terry's decision was reviewed by his manager. (AR 3, ¶ 9.) Additionally, individuals working in Liberty Life's appeals unit are charged with making an independent assessment of an adverse claim decision and do not discuss the claim with the person who denied it. (AR 3-4, ¶ 10.) Liberty Life locates these claims reviewers in separate office buildings from employees who work in its financial and underwriting departments. (AR 4, ¶ 12.)

Although Liberty Life utilizes the services of third-party medical vendors, "[n]either the outside medical vendors nor the individual reviewing physicians have authority to make benefit determinations." (AR 4, ¶ 13.) Liberty Life "has no affiliation" with the vendors or with the doctors in their referral networks. Liberty Life compensates the consultants based on a

11

predetermined schedule that does not vary based on the opinion expressed by the doctors. Liberty Life makes payment to the vendors and does not know how the vendors compensate the doctors.  (AR 5, ¶ 14.)

The record reflects that Liberty Life operates under a structural conflict of interest.  The conflict does not appear to be heightened beyond what is standard in this kind of arrangement. Although the conflict remains a factor for the court to consider, it does not deserve "special weight."  Cusson, 592 F.3d at 228.

**B.     The Scope of the Record**

"[T]he focus of judicial review, under the arbitrary and capricious standard, is ordinarily on the record made before the administrator and at least some very good reason is needed to overcome that preference."  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 519 (1st Cir. 2005).  However, "evidence outside the administrative record might be relevant to a claim of . . . prejudicial procedural irregularity in the ERISA administrative review procedure."  Id. at 520. Evidence related to "the process of decision making as being contrary to the statute" or evidence that "explain[s] a key item, such as the duties of the claimant's position, if that was omitted from the administrative record," can also be considered.  Id.

The record in this case has been supplemented with certain internal policies and guidelines, as discussed in prior orders related to discovery and as discussed herein.  Those materials have been treated, to date, as sealed exhibits.  This recommended decision divulges some of their contents to the extent they are material to the merits discussion.  The actual exhibits, however, will remain sealed.

DISCUSSION

Ganem contends that the Court should not review the administrative decision deferentially or that it should find the decision was arbitrary and capricious based on an alleged failure to follow certain internal policies and procedures and based on giving too much weight to the opinions found in Dr. Lumpkins's and Dr. Lobel's paper-only reviews.  (Pl.'s Motion, ECF No. 62.)  Liberty Life, on the other hand, argues that the decision must be affirmed because it reasonably accepted the opinions of independent consulting physicians whose views provide substantial evidence in support of the decision.  (Def.'s Motion, ECF No. 69;  Def.'s Memorandum, ECF No. 69-1.)  I address the concern over internal policies and procedures first.

## A.      Failure to Follow Internal Policies and Procedures

Liberty Life has certain internal policies and procedures that categorize fibromyalgia as a complex disability requiring special claims management attention and procedures.  Among these documents is a manual entitled Manage Complex Disabilities.  This manual classifies fibromyalgia as a complex disability and counsels that claims management requires a detailed interview with the claimant consisting of a laundry list of questions.  (ECF No. 63, PageID # 330-331 (sealed).)  The manual explains that fibromyalgia consists of three groups of symptoms: 11 of 18 reproducible tender points;  psychological factors affecting pain perception including stress, depression, and abnormal psychological profile;  and fatigue, headache, sleep disturbance, and paresthesias lasting at least three months.  (PageID # 332.)  The manual further counsels that claims managers refer a fibromyalgia disability claim for "MDS review" after gathering all of the preliminary information, including claimant interviews, activity questionnaires, and medical and pharmacy records, and preferably within the first three to four weeks of disability.  (PageID # 333.)  One potential use of MDS (Managed Disability Services) review is to ask for a

13

recommendation whether a consulting physician review is needed.  (Id.)  MDS referrals are "strongly advised." (PageID # 334.)  In effect, MDS referrals provide claim managers with access to the consultative services of nurses who can advise or even help manage a claim short of involving a consulting physician.  (PageID # 335.)

Liberty Life also maintains policies or procedures related to "independent examination/review questions."  (PageID # 336-341.)  These reflect that Liberty Life sometimes refers a claimant for independent examination and testing, including functional capacity evaluation.  The policies include a collection of questions that should be addressed to the physician or other examiner in question.  (Id.)

According to Liberty Life's Policies Procedures and Exceptions (PPE) manual, certain claims are subject to an "automated selection" for Technical Claim Management Services (TCMS).  Among the claims subject to this PPE are claims based on fibromyalgia.  (AR 70, 81 (sealed paper submissions).)

Another PPE addresses job-versus-occupation determinations.  It is meant to ensure a consistent means of comparing the demands of a particular job to the demands of the occupation as it is performed in the national economy.  According to this PPE, if it is determined that a claimant is disabled from performing his or her own job, but there are questions about whether the demands of the job are similar to the demands of the occupation as it is performed in the national economy, a referral for "vocational analysis may be necessary."  (AR 71, 82 (sealed paper submissions).)

Ganem argues that the denial of her claim should be vacated because her claim was not referred to MDS or TCMS and because no vocational analysis was sought to support the classification of her occupation as light-duty.  (Pl.'s Motion at 3-5.)  Liberty Life responds that

14

TCMS is merely a group of experienced case managers and that it does not interpret its TCMS-referral policy as mandatory.  (Def.'s Response at 9, ECF No. 69;  Heins Supp. Aff. ¶ 4, ECF No. 28.)  It observes that Mr. Terry was a senior case manager when he addressed Ganem's claim.  It also observes that TCMS referrals are not made in the context of appeals and that, ultimately, the claim came before Winterer, who had sufficient status and experience to address the matter without assistance from TCMS managers.  (Def.'s Response at 9.)  As for the MDS referral, Liberty Life says that the point of the provision is that claims managers should consult with medical professionals, which ultimately happened in this case.  Liberty Life also points to an entry in its claim note system indicating that Terry in fact sought advice from a "LMCP" who advised referral for a full file review or peer review, although this request for advice was not made within three or four weeks of the claim.  (Id. at 10, citing AR 55 (see claim note 6).)  Finally, in a footnote, Liberty Life says that its job-versus-occupation PPE is not mandatory and consists merely of "non-plan specific guidelines."  (Id. at 6 n.5.)  Liberty Life also argues that the issue is a red herring because Drs. Lumpkins and Lobel concluded that there were no exertional limitations.  (Id. at 5-6.)

The law does not require claims administrators to strictly adhere to non-plan documents such as internal policies and procedures developed to assist claims managers in their duties.  "The weight and admissibility of internal documents, whether those documents are offered in support of the interpretation of the plan administrator or that of the claimant, will vary with the facts of each case."  Glista, 378 F.3d at 123.  A court's consideration of such documents does not "impermissibly narrow[] the discretion of plan administrators."  Id. at 124.  Sometimes, but not always, an administrator's failure to follow its own procedures will reinforce an assessment that its decision was not reasonable.  See, e.g., id. at 125 (quoting with approval Cannon v. UNUM

<u>Life Ins. Co. of Am.</u>, 219 F.R.D. 211, 214 (D. Me. 2004) ("If an internal memorandum existed that favored [the claimant's] receipt of continuing benefits, the fact that it was *disregarded* would be powerful evidence of an arbitrary and capricious claims determination.")); <u>Mullins v. Conn. Gen. Life Ins. Co.</u>, 880 F. Supp. 2d 713, 719 (E. D. Va. 2010) (suggesting that substantial compliance with internal procedures is sufficient but also that noncompliance is only relevant to the extent it impacts the reasonableness determination). The failure to adhere to internal policies and guidelines informs the court's review as yet another factor for consideration in determining whether the administrator's decision was reasoned and supported by substantial evidence.

Under the circumstances of this particular case, I do not see how Liberty Life's failure to utilize TCMS or MDS prejudiced Ganem's claim. Ganem complains that some questions were not asked, but her development of the argument is cursory. At best, it appears that a TCMS referral would have involved more people in the management of Ganem's claim, but there is no basis to infer that this would have improved the chances of a favorable outcome. As for MDS, the record suggests that Terry did consult MDS, albeit later than the manual advises, and that the result was a recommendation to get an independent file review or peer review. I see no basis to find that a failure to involve MDS earlier prejudiced Ganem in any respect.

Liberty Life's failure to engage any expert assistance with respect to defining the duties of Ganem's "occupation" in comparison to the duties of her "job" presents a closer question. Although the PPE in question is not written in mandatory language, it reinforces the idea that there should be a reasonable effort to distinguish between the demands of a claimant's job versus the demands of a claimant's occupation, particularly when the distinction is a function of plan language and an administrator has previously determined that the claimant cannot perform all of the material and substantial duties of her actual job.

16

Here, Terry did not seek any vocational analysis, yet classified Ganem's occupation as light-duty and reasoned that Ganem had not demonstrated an inability to perform sustained, light-duty activity. Per Mr. Terry: "Your occupation as a Sales Specialist requires you to provide sales and service activities in a retail environment. It is considered a light occupation from a physical requirements perspective." (AR 220.) Ms. Winterer, on appeal, explained that the final conclusion remained that "there is insufficient medical evidence to establish that Ms. Ganem's condition is of a nature and severity that prevents her from performing the material and substantial duties of her own Sales Specialist occupation" and that Ganem therefore does not meet the LTD definition of disability. (AR 86.) In the context of litigation, Liberty Life now cites the Dictionary of Occupational Titles in support of its decision to treat the sales specialist job as falling into a light-exertion category when evaluated under the "own occupation" definition, which asks how the occupation is performed in the national economy. (Def.'s Memorandum at 10 n.11.)

The significance of Liberty Life's failure to develop the record in relation to its job-versus-occupation PPE depends on the relevance of Ganem's capacity for weight-bearing activity. Contrary to Liberty Life's suggestion, the matter is not a red herring because Liberty Life concluded that Ganem was disabled for purposes of her actual job and neither Terry nor Winterer articulated a finding that Ganem could engage in sustained work activity beyond the light-duty level. Liberty Life's actual decision and stated rationale for decision turns squarely on the finding that Ganem can perform light-duty work. The decision does not include a finding that Ganem can sustain work activity beyond that level. The ramifications of these facts and circumstances are considered in the context of the merits discussion of count I.

**B.      Review of the LTD Benefits Decision (Count I)**

Liberty Life frames the issue as follows:  "[T]he issue in this case is whether Liberty Life arbitrarily and capriciously determined that fibromyalgia did not prevent Ganem from performing her occupation."  (Def.'s Memorandum at 18.)  It maintains that its determination was not arbitrary and capricious because there is nothing inherently wrong with rejecting the opinions of the treatment providers and relying on the opinions of consulting physicians, particularly where the disability claim is premised on subjective complaints.  (Id. at 20-21.)  It emphasizes that rejecting the treatment providers' dismal assessments of functioning was particularly warranted because Ganem's performance in her functional capacity evaluation exceeded the treatment providers' assessments, making them less than reliable.  (Id. at 21.)  Liberty Life also contends that Ganem has limited credibility because of her failure to stick with any particular medication or with the fibromyalgia support group.  (Id. at 22.)

For her part, Ganem relies most heavily on her argument that the record demonstrates procedural shortcomings suggestive of bad faith.  (Pl.'s Motion at 1.)  She otherwise focuses on Liberty Life's failure to articulate why it classified her "own occupation" as a light-duty occupation.  She says this issue should have been referred to a vocational expert.  (Id. at 3.)  Lastly, Ganem argues that it was an abuse of discretion to give greater weight to the paper reviews of the consulting physicians than to the examination and treatment-based opinions of her providers.  (Id. at 5-6.)[2]

To begin, I set out to determine what findings Liberty Life actually made.  See Glenn v. MetLife, 461 F.3d 660, 672 (6th Cir. 2006) ("[T]he court's role is to review the basis for the decision that was actually made by the plan administrator[.]");  Sundstrom v. Sun Life Assur.

---

[2]        Ganem also lights upon the failure to make referrals to either MDS or TCMS.  (Id. at 4.)  I have already explained that I can discern no harm in that failure and for that reason I have not discussed it further.

Co., 683 F. Supp. 2d 594, 597 (W.D. Mich. 2010) ("A court must review not just the decision rendered by the plan administrator, but also the reasoning which led to the decision.").  A review of Terry's decision reveals that he did not actually make a finding of what degree of impairment Ganem experiences as a result of her fibromyalgia.  Rather, after outlining the "own occupation" standard that Ganem was required to meet, Terry classified Ganem's occupation as "light" and then informed her that he had referred the file for an independent medical review.  Terry then excerpted Dr. Lumpkins's findings that Ganem would be unrestricted physically but would suffer some cognitive symptoms from medication.  After these preliminary statements, Terry offered no actual finding to the effect that Ganem was unrestricted physically.  Instead, he stated summarily, "Based on the medical information in relation to your occupation requirements, you do not meet your Policy's definition of disability, and we must deny your claim for benefits." (AR 220.)

In effect, Terry's only actual finding was that Ganem failed to prove an inability to perform a light-duty occupation.  Pointedly, he did not find, let alone articulate a basis for finding, that Ganem actually suffered no physical impairment and was unrestricted physically.  Obviously, an experienced claims manager should understand that merely reciting verbatim the findings of a reviewing physician does not amount to making an independent finding.  The reviewing physician does not have the authority to decide the claim.  Given this presentation, the only logical conclusion about Terry's finding concerning the LTD benefit (and hence Liberty Life's initial finding) is that he found the record did not demonstrate an inability to perform a light-duty occupation.  Terry's summary decision does not include any finding concerning Ganem's ability to perform at a greater level of exertion.  To the contrary, Liberty Life's initial award of STD benefits indicates that it found Ganem to be disabled in relation to the demands of

19

her own job.  Moreover, there is reliable evidence in the record indicating that Ganem's job as she actually performed it was in the medium-duty range, including Lowe's own description stating that the job requires the handling of items weighing as much as 50 pounds.  In other words, Liberty Life's classification of Ganem's own occupation as light was pivotal to its initial denial of LTD benefits.  Why else would Terry have emphasized his light-duty finding?

Turning to Winterer's decision on appeal, it begins with a statement that "we are unable to alter the original decision to deny benefits."  (AR 84.)  Like Terry, Winterer's "discussion" commences with a recitation of the "own occupation" definition.  Immediately thereafter, it states that "the basis for the denial . . . is that Ms. Ganem does not meet the Policy's definition of disability."  (Id.)  Although Winterer included more references to Ganem's evidence than had Terry, Winterer also essentially block quoted the findings of Lumpkins and Lobel and thereafter offered no actual analysis or specific finding about the degree of Ganem's physical impairment.  In conclusion, Winterer stated:

> Thus, we conclude, based on a review of all of the medical documentation contained in Anne Ganem's disability claim file, there is insufficient medical evidence to establish that Ms. Ganem's condition is of a nature and severity that prevents her from performing the material and substantial duties of her own Sales Specialist occupation.

(AR 86.)  Once more, the only articulated finding is that Ganem failed to prove an inability to perform her own occupation, not that she failed to prove that she suffers any limitations whatsoever.  To be sure, Winterer emphasized the findings of Dr. Lobel, including his opinion that there was a "lack of clinical data supporting a neuromuscular pathology that would preclude full time work" and his opinion that "based on the medical evidence, the claimant does have the capacity to perform sustained full time unrestricted work."  (AR 85 (emphasis added).)  However,

Winterer did not actually state that Liberty Life was adopting those more extreme findings and Liberty Life had already found disability for purposes of the STD benefit.

Considering in tandem the initial award of STD benefits, Terry's decision, and Winterer's decision, the only implicit findings that make sense and reconcile them all are: (1) that Ganem provided sufficient proof that her fibromyalgia prevented her from performing her job; (2) that she did not provide sufficient proof that she cannot perform any sustained, full-time work activity; and (3) that she did not provide sufficient proof that she cannot perform at the light-duty exertion level. It is these findings that are now under review.

Considering all of the evidence in the record, Liberty Life's conclusion that Ganem failed to prove an inability to perform light-duty sustained work activity on a full-time basis is supported by substantial evidence. According to both Dr. Lumpkins and Dr. Lobel, Ganem's medical records and additional submissions failed to supply objective support for a finding that her symptoms are so severe that she cannot perform at this level of exertion. This evidence is reasonably sufficient to support Liberty Life's finding that Ganem can perform full-time, light-duty work. Consequently, it was not an abuse of discretion for Liberty Life to conclude that Ganem failed to prove an entitlement to LTD benefits under the "any occupation" standard applicable to LTD benefits beyond 24 months.

Despite the existence of substantial evidence capable of supporting the decision that Ganem failed to prove an inability to perform sustained, light-duty work activity, the question remains whether substantial evidence supports Liberty Life's decision to deny Ganem the 24-month "own occupation" LTD benefit. Liberty Life based its denial on a finding that Ganem's occupation is light-duty as it is performed in the national economy. Although neither Terry nor Winterer cited any authority in support of that finding, Liberty Life now relies on the definition

21

found in the Dictionary of Occupational Titles (DOT) for "Sales Clerk (retail sales)" and "Salesperson, Floor Coverings (retail trade; wholesale tr.)." (Def.'s Motion at 10.) As defined in the DOT, the generic sales clerk occupation is a light-duty occupation. However, the definition indicates that the occupation involves retail stores such as tobacco shops, drug stores, candy stores, or liquor stores. DOT # 290.477-014, 1991 WL 672554. Salesperson, floor coverings, is also light duty, but the definition does not suggest that the person moves stock. DOT # 270.357-026, 1991 WL 672447. An average person would not assert with any confidence that these traditional retail clerk occupations capture the duties of a sales specialist occupation within a "big box" building supply store. For example, Ganem's position appears to have included some duties similar to "Stock Clerk." The DOT classifies the stock clerk occupation as a heavy-duty occupation. DOT # 299.367-014, 1991 WL 672631. Lowe's own description of the sales specialist position indicates that it requires handling and moving items weighing up to 50 pounds. 50 pounds is on the cusp between medium and heavy work, depending on the frequency at which such weights are handled. DOT Appendix C, 1991 WL 688702.

Liberty Life's job-versus-occupation PPE reinforces the idea that it is reasonable to consult a vocational expert on the issue of how to classify the weight-bearing demands of the sales specialist occupation, as it is performed nationally. Even without this PPE, I would be inclined to recommend that the administrative decision be vacated for lack of substantial evidence. With the PPE, the structural conflict, and Liberty Life's failure to find that Ganem could work at a greater than light-duty capacity, that course of action is all the more appropriate.

"Once a court finds that an administrator has acted arbitrarily and capriciously . . . the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." Cook v. Liberty Life Assur. Co.,

320 F.3d 11, 24 (1st Cir. 2003).  The court has considerable discretion in this regard.  Id.;  See also Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 31 (1st Cir. 2005).  Liberty Life's handling of the 24-month, own occupation benefit, was arbitrary and capricious.  Liberty Life treated Ganem as having established short-term disability based on an inability to perform her actual job, but then defined a sales specialist occupation with a 50-pound weight requirement as light-duty, based on the idea that the occupation is performed differently in the national economy than it is performed locally, without any effort to support that counter-intuitive characterization with vocational evidence.  This assertion was dubious, at best, and the only evidence in the record addressed to this concern is supportive of a finding that Ganem's occupation occasionally required greater than light-duty exertion.  On this set of facts, I recommend that the court vacate the administrative decision and remand with an order to pay Ganem the 24-month LTD benefit.

**C.      The Claim for Breach of Fiduciary Duties (Count II)**

Ganem's complaint includes a second count alleging breach of fiduciary duties.  She asks that the court order reinstatement of her benefits and enjoin Liberty from "any further activity in violation of its duty of loyalty and trust to Anne Ganem."  (Complaint ¶ 42, ECF No. 18.) Liberty Life asserts that this claim is not viable because the breach of fiduciary duty claim is merely a redundant claim for benefits already raised in count I.  (Def.'s Memorandum at 23-25.) In her motion, Ganem offers simply that fiduciary duties were breached when weight was not given to her providers' opinions and when Liberty Life failed to follow its internal policies and procedures.  (Pl.'s Motion at 7.)

ERISA section 502 (29 U.S.C. § 1132) authorizes plan participants or beneficiaries to bring civil actions (1) to seek specific relief itemized in section 502(c), see 29 U.S.C. § 1132(a)(1)(A);  (2) to recover benefits, enforce rights under the terms of the plan, or clarify

rights to future benefits, see 29 U.S.C. § 1132(a)(1)(B);  or (3) to enforce provisions of ERISA or a plan, or to enjoin any act or practice that violates a provision of ERISA or the terms of a plan, or to obtain appropriate equitable relief, see 29 U.S.C. § 1132(a)(3).  Ganem has not explained how her claim for breach of fiduciary duties fits into any of the areas listed in section 502(c).  As for a claim to recover benefits, that claim has already been discussed in relation to count I. Finally, the only language of ERISA that Ganem seeks to enforce in her claim for breach of fiduciary duties is in 29 U.S.C. § 1104(a)(1)(A), which states that a plan fiduciary must discharge plan duties in the interest of participant and beneficiaries for the exclusive purpose of providing benefits and defraying administrative expenses.

Contrary to what Ganem's second count is suggesting, the fiduciary duty language of section 1104(a) does not command that benefits be paid to every participant or beneficiary who presents a claim supported by evidence.  The ERISA standard of review makes it plain that an administrator may deny benefits based on sustainable evidence even though the record may also contain substantial evidence in support of an award.  Wright v. R. R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) ("Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision.").  That standard of review could not exist if the language of section 1104(a) means what Ganem says it means.  Finally, Ganem has not described what equitable relief she is seeking that would not otherwise be available based on her first count under section 502(a)(1)(B). Generic claims for the payment of past or future benefits fall under section 502(a)(1)(B) and are not independently viable under section 502(a)(3).  Todisco v. Verizon Communs., Inc., 497 F.3d 95, 99 (1st Cir. 2007).  For these reasons I recommend that the court direct judgment for Liberty Life on count II.

CONCLUSION

For the reasons set forth above, I recommend that the court grant, in part, Plaintiff's

Motion for Judgment (ECF No. 62) and grant, in part, Defendant's Motion for Judgment (ECF

No. 61), by vacating the administrative decision to the extent it denies Ganem's claim for the 24-

month, own-occupation, LTD benefit and remanding with an order to award the 24-month LTD

benefit, and by entering judgment for Defendant on count II.[3]


NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within fourteen (14) days of being served with a
copy thereof.  A responsive memorandum and any request for oral argument
before the district judge shall be filed within fourteen (14) days after the filing of
the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 26, 2013

---

[3]      Count III presents a claim for attorney fees and costs pursuant to 29 U.S.C. § 1132(g).  This "count" is
repeated in Ganem's prayer for relief.  It is not necessary to address this remedy at this time.  See D. Me. Loc. R.
54.2.